ADOUE & LOBIT v. H. SEELIGSON & CO.

(Case No. 1111.)

1. ATTACHMENT — CONSTRUCTIVE DELIVERY — COMMERCIAL USAGE.— A cotton factor in Galveston procured an advance of money from a banker on "cotton in press," for which he gave his order on the press to deliver the cotton to a vessel then in port loading for Liverpool. The order was notified to the press, and the master of the vessel made and delivered to the cotton factor, as the shipper, a bill of lading for the cotton, which the factor indorsed and delivered to the banker, with his exchange on Liverpool, in favor of the banker, attached. Afterwards a third party, who was a creditor of the cotton factor, sued out an attachment against him and levied it on the cotton, which was still in press. In a contest between the banker, as claimant of the cotton, and the attaching creditor, held —

1. The execution of the bill of lading for the cotton by the master of the vessel in favor of the cotton factor, and the transfer and delivery thereof by the factor to the banker, constituted constructive delivery of the cotton.

2. An actual manual delivery of the cotton was not necessary to pass its possession, nor was it necessary that the delivery should have been made to the pledgee in person.

3. The special requisite of delivery is, no matter in whose hands the property was a deposit, that it be no longer subject, in fact or in law, to the dominion, possession or control of the pledgor, but to that of the pledgee.

4. The execution of the delivery order by the factor to the vessel for the cotton in press, and the recognition and acceptance thereof by the press, before the levy of attachment, constituted a delivery of the cotton, so as to except it from attachment by the creditor.

5. The transfer of the bill of lading to the banker was as effectual a transfer of the cotton as its manual delivery could have been.

6. The attaching creditor acquired no greater right in the attached property than the factor had at the time of attachment.

2. COMMERCIAL CUSTOM.— See opinion for commercial usage at the port of Galveston, regarding the compressing, transfer and shipment of cotton.

APPEAL from Galveston. Tried below before the Hon. Wm. H. Stewart.

The case is stated in the opinion.

*Ballinger, Jack & Mott,* for appellants.

*Willie & Cleveland,* for appellees, cited in support of the judgment on the facts, as they appear in the opinion, the following authorities: 1 Pasch. Dig., arts. 5310, 5329; arts. 3876, 4994, 5319; Wooten *v.* Wheeler, 22 Tex., 338; Wright *v.* Henderson, 12 Tex., 43; Gilliam *v.* Henderson, 12 Tex., 47; Edwards on Bailments, 2d ed., secs. 209, 210, 590, 591, 594; 1 Parsons on Shipping, pp. 186, 187, 190, and note; 2 Parsons on Contracts, 6th ed., bottom paging, 425; also 16 La. Ann., 316; 2 Kent, 12th ed., note 1, bottom pages 754, 788, and top page 550; 3 Kent, note 1,

bottom page 284; 44 Md., 11; Schooner Freeman *v.* Buck-ingham, 18 How., 190, 191; 2 Eng. L. and Eq., 340; 1 Smith's Leading Cases, 662; 9 Hun (N. Y.), 368; 11 Wall., 564, 565; Herman on Chattel Mortgages, pp. 64, 65, 155, 158, 160, 179, 195, 196, 197, 198, 199, 200, 206, 225, 303; 2 Greenl. on Ev., secs. 250–252; 2 Summers, 569.

MOORE, CHIEF JUSTICE.— That the questions involved in the case may be the more readily and correctly under-stood, we precede their consideration by the statement of the nature and result of the suit as furnished the court by appellee's counsel in their brief, to wit:

"This suit involved the trial of the right of property under the statute.   James Arbuckle, engaged in business in the city of Galveston as a commission merchant and cotton factor, under the firm name of Jas. Arbuckle & Co., owned one hundred and thirty bales of cotton, the property in controversy, on the 14th day of November, 1877, and had the same stored in one of the cotton presses of the city, known as the Taylor Press, holding the re-ceipt of the press therefor.   He proposed an advance of money on the cotton from Adoue & Lobit, bankers of said city, claimants and appellants in the case, who agreed to loan and advance him, and did loan and advance him, the sum of $6,113 on said cotton; and Arbuckle tendered to them a delivery order on the press for the cotton in their favor, which they declined to receive, but took in lieu thereof from Arbuckle his order on the Taylor Press to deliver the cotton to the brig 'Rana,' then loading in port for Liverpool.   This order was notified to the press, and thereupon, the cotton being still in the press, the master of the brig 'Rana' executed and delivered to Ar-buckle, as the shipper, a bill of lading, in the usual form, for the cotton, which Arbuckle indorsed and delivered to Adoue & Lobit, with his exchange on Liverpool in their favor attached.   The transaction was begun on the 14th and concluded on the 16th day of November, 1877.

"Arbuckle had an account with H. Seeligson & Co., bankers of the city of Galveston, and appellees in this case, of several months' standing, and on the 14th of November, 1877, was indebted to them, on open account, in the sum of about six thousand five hundred dollars. For this debt Seeligson & Co. recovered judgment against Arbuckle. On the 17th of November, 1877, Seeligson & Co. sued out a writ of attachment on said debt against Arbuckle, which was levied on the cotton in controversy, then in the Taylor Press, on the same day, and the cotton seized and held by the sheriff as the property of Arbuckle.

"Adoue & Lobit made oath and bond, claiming that they were the owners of the cotton. The writ, with levy indorsed thereon, affidavit and bond, were duly returned to the district court, and formed the basis of this suit, under the statute. The issue tendered, joined and tried was: 'Is the property levied on by virtue of the plaintiff's writ of attachment subject to the said plaintiff's writ; and if so, what is its value?' The case was tried by the judge, a jury being waived, and the court found upon the law and the facts, that the property was subject to the writ and was of the value of $6,073.66, and accordingly rendered judgment in favor of Seeligson & Co., the attaching creditors, against Arbuckle and his sureties on claim bond as prescribed by the statute. It does not appear in the judgment or elsewhere in the record, that the judge disclosed the grounds on which the judgment was rendered, other than that it was so rendered upon 'the law and the facts.' Motion for a new trial was overruled. Adoue & Lobit, claimants, excepted in open court, gave notice of appeal, and bring the same to this court."

Appellees also state that: "It was proved that on the 17th of November, 1877, appellees sued out from the district court of Galveston county, a writ of attachment in case No. 9,433, there pending, wherein they were plaintiffs and James Arbuckle was defendant, which was levied on same day on the cotton in controversy, then in the pos-

session of and at the Taylor Cotton Press in Galveston city, as the property of James Arbuckle, valued at $7,000; that Adoue & Lobit made oath claiming said property, and giving bond on the 22d day of November, 1877, with sureties in accordance with the requirements of the statute to try the right of property. That afterwards the cotton in controversy was delivered by the sheriff to the claimants, who sold the same for $6,773; that the claimants' bond and affidavit, and the writ of attachment, were duly filed in court, becoming the basis of this suit; that on the 22d of October, 1878, the plaintiff in attachment recovered judgment against James Arbuckle in cause No. 9,433, for $7,080 and costs of suit, and foreclosure of the said attachment lien, subject to the judgment to be rendered in this cause. Arbuckle desired to raise money on his cotton, then in the press, for which he held the receipt of the press. Adoue & Lobit, on the 14th of November, 1877, agreed to advance him $6,113, upon the faith of the cotton, upon the usual delivery order accepted by the press. He gave them the order directing the press to deliver the cotton to them. This order they declined to take, but took in lieu thereof the delivery order, which is as follows:

"GALVESTON, November 15, 1877.

"Taylor Press will deliver to brig Rana one hundred and thirty bales cotton, received for our account, as per our weighing order No. 34, for 121 bales, 9 bales mixed packed.                    JAS. ARBUCKLE & Co.

"The brig 'Rana' was in the port of Galveston loading with cotton for Liverpool. The lot of cotton in controversy, the property of Arbuckle, was in the cotton press, marked and waiting shipment, to be compressed and drayed to the vessel; the vessel to pay for compressing, and the shipper, personally, to pay for the drayage. The agent of the vessel went to the press before the execution of the bill of lading, and the press reported the cotton all

right.    The bill of lading described the cotton by numbers and marks of bales, and also described Arbuckle as shipper.    The master of the brig signed the bill of lading; Arbuckle indorsed it, and it was delivered to Adoue & Lobit, with the exchange of Arbuckle attached on the consignees of the cotton in Liverpool, and the exchange and bill of lading duly forwarded by Adoue & Lobit.    The transaction was consummated prior to the levy of the writ; on the 17th day of November, 1877, the cotton was attached as the property of Arbuckle, in the yard of the press, before it reached the brig, by Seeligson & Co., creditors of Arbuckle— Seeligson, the senior member of the firm, being a banker in the city of Galveston, and also at the same time the president of the Taylor Press Company, with which the cotton was stored.    Adoue & Lobit gave claim bond, and the cotton was then shipped to Liverpool per brig 'Rana,' in accordance with the bill of lading, and there sold, realizing less money than was advanced by Adoue & Lobit.

"At the time of the delivery of the bill of lading, Adoue & Lobit, signing themselves 'shippers,' delivered to the agent of the brig 'Rana' a memorandum, reciting the 'understanding that the cotton is now in the presses duly transferred to the vessel; that we keep the same duly covered by fire insurance until delivered on board; and that we replace it at once in case of rejection, bad condition, or other accident for which we are accountable, and deliver said agents said press receipts as soon as the goods are shipped.'    This sort of memorandum was intended by Adoue & Lobit as a guaranty to the vessel, the cotton not being actually on shipboard, and was brought into vogue by the custom of vessels in giving bills of lading for cotton in press."

To enable us to reach a proper conclusion touching the merits of this controversy, it is essential that we have a clear and definite understanding of the nature and charac-

ter of the claim or right set up by the parties respectively to the property in dispute, the precise issue or issues raised by their respective claims, and upon whom the burthen of proof thereof is by law devolved.

The appellees took the initiative in bringing about this controversy. They were the plaintiffs in the district court. We will therefore commence our inquiry by considering the nature of their claim, the status of the property and issues respecting it, as they directly or secondarily arise from this standpoint.

Beyond question the cotton was in possession of the Taylor Cotton Press in the city of Galveston as bailee of Arbuckle, as whose property it was attached, and he was the owner of it less than three days prior to the date of the levy. And as the levy was made under process, the validity of which is not questioned, if the status of the property underwent no change between the 14th and 17th of November, 1877, the day of the levy, it was unquestionably subject to the attachment. And though the status of the property might have undergone a material change, if Arbuckle still retained any right or interest in it subject to levy and sale, appellants must fail in their claim. As the return of the attachment does not show that the cotton when levied upon was in possession of appellants, the burthen of proof was upon them to show that the cotton, *prima facie* at least, was not subject to levy and sale. To maintain their claim, it devolved upon them to show such title as precluded appellees from its seizure and sale under the attachment. This they claim they did by proof of a valid and *bona fide* transfer and delivery of it as a pledge by Arbuckle to themselves prior to the date of the attachment. And this presents the real, and indeed the only question in the case. For although appellees seem in one part of their brief to insist that if appellants had proved that the cotton had been *bona fide* transferred to them as a mortgage or pledge for

money advanced to Arbuckle by them, still they did not have such title as would prevent its seizure and sale under attachment or execution, but all that could be claimed for them would be that such seizure and sale would be subject to their prior lien. But this we understand them is when they are speaking of a pledge in a general sense, as indicating merely a lien or security for a debt, and not when it is accompanied with the complete and absolute transfer of the title and possession of the pledge. For it seems to be fully admitted in other parts of their brief, and certainly cannot be successfully denied, that in such case the contingent interest of the previous owner can no more be reached by attachment or execution than if the transfer had been in every respect absolute and unconditional. Gibson v. Stevens, 8 How., 384. When the legal title and right to control and dispose of the property has passed from the previous owner, although it is merely by way of pledge, he can neither alter or change its destination except upon the condition of repaying the money for which it is pledged. And as a creditor can reach through an attachment only the interest of his debtor, the property cannot be taken from the pledgee by such writ until the money for which it is pledged is first paid or tendered. Brownwell v. Carnley, 3 Duer, 9; Stephenson v. Walden, 24 Iowa, 84; Moore v. Murdock, 26 Cal., 514; Urie v. Stevens, 2 Robinson (La.), 251; Oliver v. Lake, 3 La. Ann., 78; Badlam v. Tucker, 1 Pick., 284; Sargent v. Carr, 12 Maine, 396.

It was therefore incumbent upon appellants to maintain their claim to the property in dispute in this case, to show there had been a complete and absolute transfer of the property to them by way of pledge before the levy of the execution, because otherwise it cannot be denied that there was an interest in the cotton in the defendant in execution subject to sale. Wright v. Henderson, 12 Tex., 43; Gillian v. Henderson, id., 47; Wooten v. Wheeler, 22

Tex., 339. And because, having by their affidavit and claim bond asserted an absolute title to the cotton, they are estopped from attempting to hold it under a mere lien, for the law will not permit parties to claim and get possession of property on one ground, and then retain it upon another and different one, but they must stand upon the ground which they first elected. Luckett v. Townsend, 3 Tex., 119; Watts v. Johnson, 4 Tex., 311.

Does, then, the evidence warrant the conclusion that the title and possession of the cotton had been *bona fide* transferred by Arbuckle to appellants previous to the levy of the attachment? That it was the purpose and intent of the parties to make such a transfer, and that they mutually supposed this intention had been accomplished, there cannot be the slightest doubt. Such transfer of property was a matter of daily occurrence. While a doubt of the *bona fides* of the transaction is suggested as a ground upon which the judgment of the court below might have been predicated, it can hardly be said that its correctness has been attempted to be maintained on this ground, and there is certainly nothing in the record to authorize its being so done. True, one of the appellees and one of the other witnesses say, for a short time before the transaction out of which this suit has grown, that Arbuckle "was regarded as weak in a financial sense." But whether he was so regarded in commercial circles generally, or merely by these witnesses, is not stated; and there is no evidence that his weakness was known to or suspected by appellants. But, though Arbuckle may have been weak, he was not so weak that appellees were unwilling on the day upon which his negotiation with appellants began, to advance him upon his word $2,500. The other witness who says he was then financially weak, also says he had at that time $5,000 to his credit in witness' bank; and even subsequent to the attachment this witness made him a similar advance, as had appellants on

other cotton which he then had in this same Taylor Press. Certainly if Arbuckle's weakness did not deter these witnesses from thus dealing with him, that fact cannot cast suspicion on the fairness of his and appellants' negotiation, which seems to have been in every way open, fair and above board, and strictly in accordance with the general usage in such transactions.

But it is not sufficient to maintain appellants' title, to show that the negotiation was supported by a valuable consideration, and fair in every respect, and that in the opinion of the parties it had been fully consummated in strict conformity with law, but this must be in all essential particulars the fact. Was it so? Appellees say it was not, because, as they maintain, there was no actual or valid delivery of the cotton to appellants prior to its attachment. That an actual delivery of the property to the pledgee is certainly of the very essence of this character of contract, is not to be denied. Until possession and right to control the property has passed from and been divested out of the owner, it is not a pledge, but a mere executory contract for one. Story on Bailm., sec. 297. But what constitutes a delivery is a question of law, and depends upon the nature, character and situation of the property, and in many cases upon the custom and usage of the particular locality and line of business in which the transaction occurs. "There need not be," says Judge Story, "an actual manual delivery of the thing. It is sufficient, if there are any of those acts or circumstances which in construction of law are deemed sufficient to pass the possession of the property. Thus goods at sea may be passed in pledge by transfer of the muniments of title; as by transfer of the bill of lading, or by a written assignment thereof. So goods in a warehouse may be transferred by a symbolical delivery of the key thereof." Nor are we aware of any rule or principle of law requiring the delivery to be made to the pledgee in person. He may

receive and hold the property in person, or by and through his agent, factor or bailee, as suits his interest. The essential requisite is, no matter in whose hands the property may be on deposit, that it be no longer subject, in fact or in law, to the dominion, possession or control of the pledgor, but to that of the pledgee.

When Arbuckle commenced the negotiation with appellants for an advance upon this cotton, it was on deposit with the Taylor Press, as his bailee, and, as must have been known to every one conversant with the cotton trade at the port of Galveston, it was held for sale or shipment. It is a matter of universal knowledge that the great bulk of cotton which passes through this port, is drawn against when shipped by the owner or shipper; that the magnitude of the cotton trade is so great that it is impossible to carry it on, or move the cotton to market, except by means of bills drawn upon it. These bills are secured by the owner, or factor, if entitled to make such negotiation, by the delivery to the banker making the advance of a transfer order on the cotton press in which the cotton is held, if it is to remain here, or by the transfer to him of the bill of lading when it has been or is to be immediately shipped elsewhere. But the quantity of cotton which is sold and pledged during a business season is such, that it is impossible to transfer it all by actual or manual delivery without incurring unreasonable trouble, expense and delay. Such a mode of delivery is therefore never thought of by any one, but its delivery is effected in accordance with long settled principles of law, and well established and universally recognized custom and usage, by delivery order, to the warehouse or press where the cotton is in store, or a transfer or assignment of the bill of lading, if a bill of lading has been given for it by the vessel by which it has been, or is to be shipped. The first of these modes of transfer is admitted to be legitimate and effectual. But it is denied that the second is, unless the cotton has been in fact placed

aboard the ship before the bill of lading was given by the master. Because, as appellees insist, the master is not authorized to give a bill of lading until freight is placed aboard his vessel. And it is no doubt true as a general rule, that the master cannot, by receipting for freight which never in fact comes to the ship as freight, or into his custody or control as master, bind the ship or its owners. Grant v. Norway, 2 Eng. Law and Eq., 337; Baltimore & Ohio R. R. Co. v. Wilkins, 44 Md., 11; Halliday v. Hamilton, 11 Wall., 560; La. Nat. Bank v. Laveille, 52 Mo. 380.

But the point decided in these cases is simply that bills of lading are not commercial or negotiable paper in the hands of an innocent party, which precludes or estops the owner from denying that the freight was received as therein admitted.

Here there is no question as to the liability of the boat or its owners; and certainly these cases in no way tend to show that by the custom and usage of a particular port or trade, a master may not be authorized to bind the boat or owners by receipt of freight, before it reaches the boat, or while it is in the warehouse waiting to be compressed for the convenience and benefit of the boat. Still less do they tend to show that although such bill may not bind the owners of the boat, if the freight does not in fact reach the boat, that the bill and its transfer is not valid and binding and operative as between other parties. (See cases referred to and those therein cited and commented upon.)

But suppose it is true, as claimed by appellees (which need not be considered until the question is before us for decision), that authority has not been given by law, or the custom or usage of the port of Galveston, to bind the boat by receipting for cotton while in press. How can this affect the question of delivery or non-delivery of the cotton as between Arbuckle and appellants; and if as between them the contract of pledge or bailment was con-

summated by delivery, appellees were not entitled to attach it as the property of Arbuckle, because appellants took upon themselves the risk of the cotton press in the matter of the delivery of the cotton aboard the ship. Whatever may be the rights and duties of the masters as respects the owners of the vessel, the custom and usage in the transfer and delivery of cotton in case of sale or pledge is shown by the record to be well understood and respected by masters, bankers, factors, presses, and all persons interested or dealing in cotton in the port of Galveston, and is thus stated in their brief by appellees' counsel:

"The press is the bailee or custodian of the cotton for the owner, giving its receipt, and holding subject to his delivery order. The owner sells or pledges his cotton by executing a delivery order in favor of the buyer or pledgee on the press. The acceptance of this order by the press and corresponding entry on its books constitutes the delivery of the cotton, and is so treated and respected by bankers, factors, presses and all parties dealing in cotton. Upon acceptance of the order, the press holds the cotton for the party to whom the delivery order is made. If the order is in favor of an individual, the press holds for that individual; if in favor of a ship, the press holds for that ship, no other party being recognized by the press as having the right to interfere with or control the cotton. The vessel, ordinarily, is entitled to the cotton after she gets the order, and it is drayed to her wharf as soon as compressed, by the drays of the press, for which the press is paid by the shipper; the compressing is paid by the vessel and is done on its order; the cotton is then conveyed by the drays of the press to the wharf and actually delivered to the vessel on the wharf, and thereupon the vessel executes receipts to the press for the cotton, which receipts are surrendered by the press to the shipper, as vouchers or releases."

" When a broker advances on cotton in press," says one of the witnesses (who is fully sustained by all of the others), "he requires, if the cotton is not intended for immediate shipment, a delivery order in his favor, and this order being accepted by the press, he makes the agreed advance, there being no actual delivery or change of locality of the cotton, and the press thereafter holding the cotton for the broker as against the former owner and all others. This he regards as delivery, and effectual for his protection. In case the cotton is destined for immediate shipment, the order may be made to ship direct, and a bill of lading predicated on such an order would secure the advance by negotiating the bill of lading, although the cotton was not on board of the ship, but still in the press."

And subsequently one of the appellees testifies: " Cotton is changed from one party to another by delivery order, accepted by the press. The press respects the order, enters it on its books, and holds the cotton for the party indicated in the order. It involves no change of locality in the cotton orders, for delivery to vessels are frequent. And then the *press ceases to hold for the late owner,* but holds for the vessel. The cotton being regarded as having passed into the control of the vessel, nobody except the vessel can have it removed." Compressing is done by the press on the order of the vessel for whose benefit it is done, and by whom it was paid for; evidently, therefore, it must be transferred by delivery order to the vessel, to enable the vessel to have it compressed and delivered to itself. When this is done, it is certainly right and proper that the agent or master of the vessel should give to the owner, shipper or pledgee, a bill of lading, receipt or acknowledgment, showing for and on whose account the cotton had been transferred to it. And upon general principles of law, as well as the custom and usage of trade, the transfer of such bill of lading or evi-

dence of title is as effectual a transfer of the cotton as its manual delivery, if that was possible.

In the case of Bryans v. Nix, 4 M. & W., 774, the court uses the following pointed and emphatic language:

"The transaction is, in effect, the same as if Tempany had deposited the goods with a stakeholder, who had assented to hold them, for the plaintiffs, in order to indemnify them. As evidence of such transaction, it is wholly immaterial whether the instruments are bills of lading or not; and it might equally be proved through the medium of carriers' or wharfingers' receipts, or any other description of document, or by correspondence alone. If the intention of the parties to pass the property, whether absolute or special, in certain ascertained channels, is established, and they are placed in the hands of a depositary, no matter whether such depositary be a common carrier, or ship-master, employed by the consignor, or a third person, and the chattels are so placed on account of the person who is to have that property, and the depositary assents, it is enough; and it matters not by what documents this is effected; nor is it material whether the person who is to have the property be a factor or not; for such an agreement may be made with a factor, as well as any other individual."

See also National Bank v. Merchants' Bank, 1 Otto, 92; Sampson v. Gazzam, 6 Porter (Ala.), 123; Cross v. O'Donnell, 44 N. Y., 661; Searle v. Keeves, 2 Espinasse, 598.

Although appellees strenuously maintain, because, as they claim, the master may not give a valid bill of lading until freight is received aboard the boat, the transfer of a bill which may have been prematurely executed will not operate as a transfer of the title and possession of the property covered by it, they have, however, cited no authority to sustain this proposition. Those relied upon are the cases already referred to, to wit: The Louisiana National Bank v. Laveille, 52 Mo., 380; The Marine Bank

*v.* Josiah M. Fisk *et al.*, 16 N. Y., 363; in neither of which was there any question touching the validity of the indorsement or transfer of the bill. Reference is also made to the case of Halliday *v.* Hamilton, 11 Wall., 560, where the court say: "It is argued that the bill of lading did not effect the transfer of the property, because when it was executed the corn had not been received by the transportation company." Because the attachment was after it was received aboard, and the bill became operative as soon as the corn was in the custody of the boat, it was, as the court held, unnecessary to consider what would have been the rights of third parties if the attachment had preceded the delivery of the corn. But even the case suggested was unlike this, for there the bill of lading was given at St. Louis before there had been a delivery of the corn to the boat or any one for it, while the corn was in a warehouse more than a hundred miles distant. The terms of sale seem, the court say, to contemplate payment in cash. Yet not a dollar was paid and the attachment was by the vendor for the purchase money.

It is also urged that if the property can be transferred by the indorsement of this bill of lading, it will open the door for fraud. Certainly not more so than a transfer by bills given when the freight is placed aboard ship. And but little more than by transfer to an individual by delivery order when the cotton is in the press. In either case, if there is fraud, the transfer is void as against creditors and purchasers. That property may be transferred in this way unknown to creditors, and in some instances may be a cover for fraud, is one of the incidents of trade and commerce. Ordinarily it seems not to be necessary that the bailee should know of the transfer to render it effective. Gibson *v.* Stevens, 8 How., 384. Here the transfer to appellants could hardly have been a secret. The delivery order to the ship could have scarcely left a doubt in the minds of persons engaged in the cotton busi-

ness, that it was for the purpose and with the intent to predicate an advance in the usual course of business upon the bill of lading. Its consummation required the participation of the master and agent of the ship and the appellants' bond or memoranda given to the agent, reciting that the cotton was in the press, duly transferred to the vessel, and must have been attended with as much publicity as a transfer of the cotton by a delivery order.

After a careful examination of the facts and law of the case, we are clearly of opinion that the judgment should be reversed, and judgment here rendered in favor of appellants for the cotton claimed by them, and for all costs in this behalf expended in this and the district court, and it is so ordered.

REVERSED AND REMANDED.

[Opinion delivered March 29, 1881.]