## TEXAS & PACIFIC COAL COMPANY V. THOMAS LAWSON.

### No. 1663.

1. **Reconvention—Damages—Distress Warrant.**—Damages both actual and exemplary arising from the illegal issuance and levy of a distress warrant may be pleaded in reconvention in an action for rent due by written lease.

2. **Corporation—Damages—Malice of Officer—Ratification.**—Where the president of a corporation, acting within the scope of his authority, and in furtherance of its interests, conspires with its other officers to obtain possession of premises leased by it, and to drive the lessee out of business and ruin him, and maliciously and oppressively uses the process of the courts for that purpose, the corporation will be liable both for actual and exemplary damages where it ratifies his acts in the premises.

3. **Parol Evidence Varying Written Instrument.**—A written lease purporting to be a complete contract can not, in the absence of fraud, accident, or mistake, be varied by proof of a contemporaneous parol agreement ingrafting an additional consideration; nor is the rule changed by the fact that such additional consideration was purposely omitted from the lease.

4. **Pleading—Justification—Inconsistency.**—Where plaintiff has seized certain goods under a distress warrant, alleging them to belong to defendant, and asking to foreclose a landlord's lien thereon, and the defendant denied in his answer the existence of any lien, alleging a wrongful seizure, the plaintiff could not, under only a general denial of such answer, shift his position and justify the seizure under a claim of ownership of the goods, but should have specially pleaded such justification and the grounds thereof.

5. **Bill of Exceptions—Practice on Appeal.**—The exclusion of evidence by the trial court can not be reviewed on appeal where the bill of exceptions does not show the ground of objection made to the evidence.

**6. Wrongful Levy of Distress Warrant—Evidence of Malice and Conspiracy.**—Where defendant's plea in reconvention charged a conspiracy between the president of plaintiff's corporation and the officers, averring that the latter were but tools in the hands of such president to carry out his purpose to destroy the business of the defendant and drive him away, evidence is admissible to show that the justice of the peace who issued the distress warrant and the constable who levied it were employes of plaintiff.

**7. Same.**—So, it was permissible under such allegations of malice and conspiracy for the defendant to show, that before the levy of the distress warrant the president of the plaintiff company made a personal attack on defendant, and that two of his employes had a personal difficulty with defendant's manager, with him at the time.

**8. Evidence—Books of Account—Statement.**—Where defendant's original books of entry were seized by plaintiff under levy of a distress warrant, and are in court at the time of the trial, it was not error to permit defendant to introduce a statement of accounts between himself and plaintiff, accompanied by testimony that such statement was a correct transcript from the original books; that it was made by defendant, who was a competent bookkeeper, and had been verified by him and by plaintiff's bookkeeper.

**9. Lease—Agreement to Furnish Statements—Covenant or Condition.**—Where a lessee was to pay as rent a portion of the proceeds of his business, an agreement in the lease that he would furnish the lessor with statements of the business monthly, or oftener, if required, was not a condition, but a mere covenant, the breach of which did not justify the lessor in taking possession of the leased premises.

**10. Same—Evidence of Waiver of Stipulation.**—Evidence that the lessee was ready to render statements of his business monthly as required by the lease, but was told by the lessor's secretary that it might be postponed, and that once a quarter was often enough, was admissible to repel any inference of bad faith on the lessee's part in failing to make monthly statements.

**11. Evidence—Cross-Examination of Witness—Credibility.**—It is permissible to show on the cross-examination of a witness, and as bearing on his credibility, that he has been indicted for a crime and is then being held in jail awaiting trial on the charge.

**12. Same—Predicate for Impeaching.**—Where the predicate has been laid by asking a witness as to a conversation by him in which he admitted that he had been bribed to testify, and he denies any recollection thereof, it is permissible to prove such conversation by the party with whom it is alleged to have been held.

**13. Evidence—Deposition.**—A deposition can not be supported by showing, that at another time and place and on another occasion witness made similar statements.

APPEAL from Hood. Tried below before Hon. C. K. BELL.

*Hunter, Stewart & Dunklin*, for appellant.

*T. L. Nugent* and *John W. Wray*, for appellee.

TARLTON, CHIEF JUSTICE.—On August 26, 1889, the appellant, a corporation, through its president, R. D. Hunter, entered into a contract in writing with the appellee, Thomas Lawson, the contract to relate back and take effect from June 1, 1889. By its terms, the appellant leased to the appellee, for the period of five years from June 1, 1889, "the saloon, cold storage building, and dwelling house, with four rooms and yard accommodations, covering about an acre of ground,

situated in the coal-mining camp called 'Thurber,' in the county of Erath, State of Texas, with the appurtenances.'' The sole rental consideration fixed by the terms of this instrument to be paid by the appellee to the appellant was the sum of $150 monthly during the term of the lease. On March 31, 1890, the appellant, through its president, R. D. Hunter, again entered into a contract in writing with the appellee, by the terms of which it leased the identical property to the appellee for the period of five years, to commence April 1, 1890. The rental consideration stipulated in this instrument to be paid by the appellee to the appellant was ''a sum of money equal to two-thirds of the net profits arising from said business monthly during the term of this lease.'' The appellant agreed: '' During the term of this lease, to issue checks to all persons in its employ to whom money may be due for wages or labor performed, and to redeem weekly all checks so issued which the party of the second part [the appellee] may receive for wines, beer, or spirituous liquors sold by him.'' The appellee also agreed to render to the agent of appellant monthly statements showing the full, complete, and accurate status of the business, and oftener, if so required by the appellant; and further, that he would not sell or permit to be sold on the leased premises any kind of beer, wine, or liquors on Sundays, and that the premises should be kept in a cleanly and orderly manner, and that he would not permit in or about them any disorderly or riotous conduct; that he would not assign the lease or sublet the premises, or any part thereof, to any person, without first obtaining the written consent of the appellant; that a breach of this stipulation shall, at the option of the appellant, terminate the lease, and entitle the company to immediate possession of the premises; and that a failure on his part to permit the appellant to fully inspect the books and condition of the business at any time when so requested, or the failure to promptly pay over monthly such a sum of money to the appellant as shall be equal to two-thirds of the net profits of the business, shall terminate the lease at the option of the appellant, and entitle it to immediate possession of the premises, without a written demand for possession and notice to vacate. The appellee further obligated himself to carry on and conduct the saloon business in a prudent, economical, and businesslike manner, and to give such of his personal time and attention to it as it may require, to fully carry out the meaning and intent of the contract. On August 25, 1890, the appellant made its affidavit for a distress warrant, claiming, under the terms of the second lease, an indebtedness at that date against the defendant and appellee, Lawson, for four months' rent, beginning April 30, 1890, and ending July 31, 1890, of $4002.59. A bond having been executed, a distress warrant was accordingly issued on the same day, and levied upon certain goods, wares, and merchandise as the property of the defendant, Thomas Lawson, being in the saloon already described. The goods thus seized were invoiced by the officer at a valuation of $4367.13. Under order of sale, they were sold

pending the proceedings, on the application of the plaintiff, as perishable property, belonging to the defendant, for the sum of $1006.30. The justice of the peace who issued the warrant also issued a citation to Lawson as provided by the law, which was duly served. The entire process was returned to the August Term, 1890, of the District Court of Erath County. The cause was subsequently, by change of venue, transferred to Hood County.

By an amended petition filed September 7, 1891, the plaintiff (appellant) alleged the following matters of indebtedness: (1) The sum of $4002.59, due in the manner already stated; (2) $1000 as representing two-thirds of the net profits of the saloon business from August 1, 1890, to August 25, 1890, the date of the distress warrant, which item was not embraced in the distress proceedings; (3) a balance of $308.92 for certain described goods sold by the plaintiff to the defendant from April 22, 1889, to July 31, 1890; (4) the sum of $13,500, growing out of facts alleged substantially as follows: That on June 1, 1889, the defendant rented from the plaintiff the premises described, for the term of five years, beginning June 1, 1889, that the contract of rent was reduced to writing August 26, 1889, and was made to relate back to June 1st of that year; that, by the terms of this contract, the plaintiff leased to the defendant the property and premises described, and the right to sell wines, beer, and spirituous liquors, for the term of five years from June 1, 1889, and the consideration of the lease and exclusive privileges was, as expressed in the lease contract, $150 per month in cash, but that the lease contract was in fact based upon the further consideration, which was not expressed in the contract, but fully agreed on by all the parties thereto, as follows: Thomas Lawson was to pay at the end of each month a rental for the premises, and the exclusive privilege, two-thirds of the net profits of the saloon business at Thurber; that the two-thirds of the profits were reserved and agreed to be paid to R. D. Hunter and Ed Marston, because at that time it was thought best for the plaintiff company to appear as not having any interest in the saloon business whatever, but the two-thirds profit was in fact a further consideration for the rent of the property and exclusive privilege, and Hunter and Marston intended and agreed with the plaintiff to hold this profit for the use and benefit of the plaintiff, and turn it over to the plaintiff; that in fact and in truth, the plaintiff was the owner and entitled to collect the two-thirds profit, as well as the $150 per month, as a rental for the property and exclusive use of the premises, and this the defendant, Lawson, as well as the plaintiff itself, and Hunter and Marston, well knew; that this contract continued in force until the 1st day of April, 1890, when the contract and lease already set out as bearing date on March 31, 1890, was made and entered into between the parties, at which time the first lease was merged into the second; that during the ten months in which the saloon business was carried on at Thurber under the contract dated August 26, 1889, the net profits of the business over and above the $150 a month

amounted during each of the months to $1800, and that two-thirds of the profits was $1200 per month, amounting in the aggregate to $12,000; that the plaintiff, in pursuance of the contract of August 26,1889, delivered to the defendant the premises named, and the exclusive privilege granted, and in every respect fully complied with the terms and conditions of the lease contract incumbent upon it, and that the defendant used and enjoyed all the premises and privileges to the fullest extent; that, by reason of the facts stated, the defendant became liable and promised to pay to the plaintiff and R. D. Hunter and Ed Marston, trustees for the plaintiff, the sum of $150 per month, and the further sum of two-thirds of the net profits of the business, amounting in all to $13,500.   Of this amount the court sustained a special exception in the sum of $12,000, so that no question concerning it was submitted to the jury, except as to $1500.

The defendant answered, pleading, among other matters, that the plaintiff was indebted to him as follows: (1) The sum of $1693.45, as a balance due when the second lease went into effect by the plaintiff to the defendant for cash paid to plaintiff, merchandise sold to the plaintiff, and for checks turned over to the plaintiff, for commissions due the defendant for coal sold by the defendant for the plaintiff, for rebate on saloon rent, for a railroad claim recovered, for rebate on saloon fixtures, and expenses incurred while hiring men for plaintiff, which matters were set out in an itemized statement; (2) the sum of $2852.44, due at the time of the suing out of the distress warrant for merchandise supplied at plaintiff's request, for merchandise coupon checks and cash delivered and paid plaintiff between April 1, 1890, and May 31, 1890, also set out in an itemized statement; (3) the sum of $1000, due at the date of the distress warrant for services rendered by the defendant for the plaintiff in employing miners between December 11, 1888, and May 15, 1889; (4) the sum of $60, due at that date for commissions on coal sold by the defendant for the plaintiff; (5) the sum of $3066.50, represented by merchandise checks and due bills issued by the plaintiff, and which, after the execution of the second lease contract, the defendant received in the usual course of trade, in exchange for merchandise; (6) the sum of $7000, the value of the defendant's property seized by the plaintiff, and converted by virtue of the distress warrant alleged to have been wrongfully and maliciously sued out; (7) as actual damages for being deprived of the lease and the privileges incident thereto, the sum of $30,000; (8) exemplary damages in the sum of $20,000.

On August 7, 1892, the jury returned in favor of the defendant a verdict itemized as follows:

"Due on account by Texas and Pacific Coal Company....$   750.24
"Due on stock and other property levied on ............. 3,985.33
"Due on interest on stock ..............................   478.23

" Due damages for the value of the lease................$  6,852.60
    " Total as actual damages ........................$12,066.40
" As exemplary damages ........... .................  6,000.00
    " Total............................... ............$18,066.40 "

From a judgment entered in accordance with this verdict, an appeal is prosecuted to this court. The verdict rests upon evidence, and by it we are constrained to find that, at the time of the levy of the distress warrant, the plaintiff was indebted on account to the defendant in at least the sum of $750; that the defendant, therefore, owed the plaintiff no rent; and that actual and exemplary damages were sustained as stated in the verdict.

*Opinion.*—The second, third, fourth, fifth, sixth, seventh, and ninth assignments of error are presented together. They complain of the action of the court in overruling exceptions to the allegations of the defendant's answer whereby it is sought to recover actual and exemplary damages for the wrongful suing out and levy of the distress warrant. The allegations are too lengthy and elaborate to justify insertion. The exceptions seem to assert the twofold contention (1) that the matter pleaded, involving an unliquidated demand, could not serve as a defense to the plaintiff's cause of action for debt; (2) that the corporation could not be held liable for exemplary damages for acts committed by its president, R. D. Hunter. The exceptions were properly overruled. The demand asserted by the defendant was the legitimate subject matter of a plea in reconvention, and it was such a plea that in the feature complained of was urged in this answer. Its averments show that Hunter, the president of the corporation, acting within the scope of his authority, in furtherance of the interests of the company and in the management of its affairs with which he was charged, entered into a conspiracy with other officers of the company whereby he prostituted the process of the courts to the accomplishment of the malicious and oppressive purpose of unjustly securing possession of the leased premises by depriving the defendant thereof, and of ruining him and breaking him up in his business, in the interest of the corporation, which ratified his acts. The relation between Hunter, the president, and the corporation, is so graphically portrayed by these lurid allegations as to become substantially one of identity. The president was the corporation in effect—the king and the kingdom. If the averments were true, they justified a verdict for actual and exemplary damages against the corporation. Dillingham v. Anthony, 73 Texas, 47; Railway v. Johnson, 86 Texas, 424; Railway v. Harris, 122 U. S., 597.

The eighth and tenth assignments are overruled. The averments of the answer assailed by them show that the justice of the peace whose acts are referred to was a party to the conspiracy already alluded to;

that he was but a tool in the hands of the president of the corporation, acting for the corporation as above indicated.

We are constrained to overrule the eleventh assignment of error, wherein complaint is made that the court sustained the defendant's exception to that portion of plaintiff's pleadings alleging that in addition to the $150 consideration expressed in the contract of June 1, 1889, it was verbally agreed among the parties that Hunter and Marston, or the plaintiff, were to receive at the end of each month a rental of two-thirds of the net profits of the saloon business at Thurber. The action of the court must be justified upon the familiar principle that, in the absence of fraud, accident, or mistake, the lease, having been reduced to writing, must be presumed to contain the entire agreement of the parties. There is no allegation that in this case the omission was due to fraud, accident, or mistake. We can not liken the contract in this instance to the case of a deed, where it is permitted to contradict the recited consideration by parol evidence showing the true consideration. Gibson v. Fifer, 21 Texas, 263; Glenn v. Mathews, 44 Texas, 406. Here the writing purports to set out with great detail the agreement of the parties. It appears to be in every respect complete. The statement of the consideration is not the "mere recital of a fact, viz., the amount of the consideration," but it is an "agreement about it." It is contractual, and it can not be varied by proof of a parol contemporaneous agreement, ingrafting an additional consideration. Pickett v. Green (Ind. Sup.), 22 N. E. Rep., 737; Pennsylvania Co. v. Dolan (Ind. App.), 32 N. E. Rep., 806.

Nor does the appellant's proposition that a statement in the contract of the additional consideration was purposely omitted strengthen his position, as has been by our Supreme Court expressly held under a similar condition. Sanborn v. Murphy, 86 Texas, 441.

The court admitted evidence in behalf of the defendant, to the effect that the Texas and Pacific Coal Company, by its officers, refused to allow the appellee or his employes to trade at its stores and meat market, and refused to sell them goods and drugs, or to furnish them water, or to allow them to use the horses and vehicles in the livery stable. It appears that the town of Thurber, the property of the appellant, contained at the time referred to more than 2000 inhabitants; that the plaintiff owned a number of stores—a drug store, a hardware store, and general stores—furnishing supplies to the people living within the inclosure of the town or mining camp; that it supplied water to its lessees and employes; that it ran a livery stable and a boarding house for the use and convenience of these employes. The defendant's answer charged that the president, R. D. Hunter, and other officers and agents of the plaintiff, conceived a design to harass the defendant, and ruin his business, and deprive him of the leasehold and privileges thereunder, that, shortly after the execution of the second lease, the president, Hunter, became unfriendly towards the appellee, and in furtherance of the design to ruin and destroy his business, and to acquire the

premises for the use and benefit of the appellant, by the exercise of his power as president and general manager of the corporation, commenced and continued a systematic course of persecution and improper treatment of defendant, his employes, and their families; that by the instructions of Hunter, while acting for appellant in the scope of his authority, and in pursuance of the design above mentioned, the appellant' stores and other business houses upon which the appellee, his employes, and their families, were dependent, and on which, under the contract with the appellant and the surrounding circumstances, the appellee and his employes had the right to rely for supplies and for the various conveniences indispensable to the running of the saloon business, were closed to the appellee, his employes, and their families, by the appellant's agents, who refused to sell to appellee or his employes any supplies or merchandise. The evidence above set out is assailed as inadmissible in the twelfth assignment of error. It was relevant, and in direct response to the averments of the defendant's answer.

The court rejected evidence offered by the plaintiff that, at the date of the execution of the second lease, Hunter and Marston owned an interest of two-thirds in the stock of goods in the Thurber saloon, which interest was subsequently transferred by them to the appellant. This action of the court is complained of in the thirteenth and seventeenth assignments of error. It is insisted that, as the evidence elsewhere shows that a large portion of the goods in the saloon on April 30th was in the stock levied on by virtue of the distress warrant, it follows that, if Hunter and Marston were owners of a two-thirds interest on April 30th, they or their assignee, the appellant, would be proportionately interested in the stock on hand at the date of the levy, and to that extent the defendant should be denied a recovery. The proffered evidence was properly excluded. The plaintiff instituted this suit pleading that the defendant owned the goods in question, on which the plaintiff had a landlord's lien, which it sought to foreclose. It caused the issuance of a distress warrant upon that theory, and the levy of the warrant upon the goods as the property of the defendant. It caused, pending the proceedings, a sale of the goods, as the property of the defendent and as perishable property. The return of the officer upon the warrant and upon the order of sale shows this fact. At this sale it purchased a large quantity of the goods, taking title to them as the property of the defendant.

To the petition, thus asserting the plaintiff's cause of action, the defendant answered, alleging a fact already made the basis of the plaintiff's proceedings—that the appellee owned the property—and denying the existence of the lien averred by the former, and pleading in reconvention for damages on account of the wrongful seizure of the defendant's property, thus alleging a trespass by the plaintiff. To this answer the plaintiff filed a supplemental petition, containing a general denial, and insists that, under this plea in bar, it should be permitted, in

mitigation of the damages, to show the falsity of the fundamental fact upon which it relies for recovery, viz., that the defendant had title to the goods, and that the plaintiff had a lien thereon. The record thus standing, to permit the plaintiff to adopt such a course would be to permit it to assume an attitude wholly variant from the issue tendered by its own allegations—an attitude inconsistent and duplicitous—and this without warning to the defendant. The issue tendered by the defendant's answer was one not of title, but of trespass. If the plaintiff intended to justify his act, in whole or in part, in seizing this property, he should have pleaded specially the facts which constituted the justification. Carter v. Wallace, 2 Texas, 206. By the evidence proffered, the plaintiff sought to show the existence of a condition wholly different from that on which its proceeding rests. It seeks to shift its position from that of a lien holder to that of an owner. If, in reply to the cause of action of the defendant, the plaintiff could under any circumstances be permitted thus to change its attitude, it should have notified its adversary by proper averments. Adams v. Hicks, 41 Texas, 243. Having instituted this proceeding upon the fundamental fact alleged by it—that the defendant had title to all the goods in question—and having caused them to be sold as the property of the defendant, and the sale to be thus returned by the officer making it under the order of the court, the plaintiff should not be allowed, in the absence at least of special averments, to upturn the entire fabric thus reared by it, and contradict collaterally the return of the officer upon the process sued out by it. Schneider v. Ferguson, 77 Texas, 576. See also Garrity v. Thompson, 64 Texas, 597; Adoue v. Seeligson, 54 Texas, 593.

A witness, H. C. Malcolm, an employe of the defendant at the Thurber saloon during the troublous times which followed the execution of the second lease, testified in turn for the defendant and for the plaintiff. In his deposition taken in behalf of the plaintiff, he stated, among other matters, as follows: "I never had anything to do with making up the statement furnished by Lawson to the plaintiff, nor did I ever see one that was turned in to the company, that I remember of. Mr. Lawson did that himself, and consequently I can not swear positively whether they were true or not. The fact that he had me cut the cash receipts in half leads me to believe that they were not true, as I distinctly understood that the purpose of dividing the receipts was to gain for himself one-half for which it was not his purpose to account. It is my belief that the said statements did not represent the true amount taken in at the saloon, because of the fact of Lawson having instructed me to divide the money as heretofore described in cross-interrogatory 44." The court, on the defendant's objection, excluded the following portions of this answer: "The fact that he had me cut the cash receipts in half leads me to believe that they were not true. It is my belief that the said statements did not represent the true amount taken in at the saloon, because of the fact of Lawson having

instructed me to divide the money as heretofore described in cross-interrogatory 44."

The bill of exceptions complaining of this exclusion does not state the ground of the objection sustained by the court. This bill and the assignment thereon predicated are therefore not entitled to consideration. Johnson v. Crawl, 55 Texas, 571; Tel. Co. v. Arwine, 3 Texas Civ. App., 157. If, however, as we infer, the testimony was rejected on the ground that it was but a statement of the belief or opinion of the witness, not an expert, we are not prepared to hold that the action of the court can be properly complained of. To this opinion or belief (if admissible, which we do not hold), the witness elsewhere substantially testifies thus: "I never had anything to do with making up the statements of the business of the saloon, nor did I ever see one that was turned in to the company that I know of. Mr. Lawson did that himself, and consequently I can not swear positively whether they were true or not. I distinctly understood that the purpose of dividing the receipts was to gain for himself one-half, for which it was not his purpose to account." The plaintiff had, in effect, the benefit of the rejected testimony.

In his deposition taken in behalf of the defendant, the witness Malcolm testified, that "he did not have access to defendant's books, but from what he did see of them, having observed them casually on different occasions, he was positive that the books showed correctly all the receipts and disbursements, and that nothing irregular in that regard ever happened during his connection with Mr. Lawson at Thurber." The plaintiff moved to exclude this statement as to what the books showed, because "the witness in his answer, and in his further answer wherein he stated that he did not keep the books, and did not have control over them, shows that he had no knowledge of the books." The testimony of the witness in other portions of his depositions does not show that he was wholly ignorant of the books, nor, indeed, does it so appear in his statement. The motion to exclude referred to in the fifteenth assignment of error was therefore properly overruled.

So we overrule the sixteenth assignment, which complains of the admission of the evidence on cross-examination of the witness R. D. Hunter, to the effect that James Williams, who was appointed a deputy special constable to serve the distress warrant, was at the time of the appointment in the employ of the plaintiff as a livery stable keeper; and that Stenson, the justice of the peace who issued the distress warrant, was in the employ of the plaintiff as its druggist. This evidence was relevant, under the averments of the defendant charging a conspiracy between Hunter and the officers, and averring that the latter were but tools in the hands of the president to carry out his purpose to destroy the business of the defendant, and to drive him out of the camp, and to deprive him of the leasehold and the leased premises.

The eighteenth assignment of error is as follows: "The court erred in refusing to charge the jury, as requested by plaintiff, that 'as to the item of $1693.45, charged by defendant against plaintiff as due to him from plaintiff on account of business under first lease, I instruct you, that if you believe from the evidence that R. D. Hunter and E. L. Marston were each entitled to one-third of the same, that you will not allow defendant any part of same as against the plaintiff.'" The sum of $1500 of the item here referred to represents the amount accruing for rents under the terms of the first lease. It was claimed by the defendant that in entering into the second lease this amount was rebated to him by the plaintiff. Under the evidence, if Hunter and Marston were entitled to anything, it was not as sharers of the monthly rental of $150, but as sharers of two-thirds of the undivided profits of the concern. The item was not pleaded by the defendant as due him as profits of the concern, but as a rebate of the rent. The charge did not conform to the pleadings or the evidence, and was properly refused.

Over the objection of the plaintiff, the defendant was permitted to introduce in evidence a statement of his account with the plaintiff. This was accompanied by testimony that it was a correct statement of the cash account current between the parties; that the defendant took his books, and the secretary of plaintiff took the books of the plaintiff, and that they compared them, and found the items exactly as shown by the statement offered; that the statement was made by the defendant, in his handwriting; that he was a bookkeeper, and understood keeping books; that he kept his books correctly, and that the statement was a correct transcript of his books. The books of original entry from which this transcript purported to have been taken, and which had been seized by the plaintiff at the time of the levy, were themselves in court subject to inspection. Under the circumstances thus disclosed, the court correctly admitted the evidence. The correctness of the abstract or transcript taken from the books was attested by the witness as a competent bookkeeper. It had been verified by the defendant and the secretary and bookkeeper of the plaintiff. In the light of the books of original entry, which had been in the possession of the plaintiff since the levy of the distress warrant, the defendant was subject to cross-examination. Culver v. Marks, 122 Ind., 554; Rice v. Schloss, 90 Ala., 416.

The twentieth assignment complains of the admission of evidence showing that some time in July, 1890 (before the levy of the distress warrant), in the plaintiff's drug store at Thurber, R. D. Hunter (president of the company) attacked defendant and struck at him, when the defendant struck back, and he and Hunter had a scramble; that defendant got down in the street, and on his way back defendant's manager, Malcolm, who was with him, got into a scrap with Ward (an employe or agent of the plaintiff) and Sullivan, the special ranger (likewise an employe of the plaintiff), which resulted in all being

summoned to Stephenville for a breach of the peace, where they were fined. This testimony was admissible under the appellee's allegations charging malice against the corporation, through its president, Hunter, and charging conspiracy, already referred to, with the purpose of driving the appellee from the camp, and of depriving him of the leasehold, and of ruining him in his business.

The twenty-first assignment complains of the admission of testimony by the defendant that he went to St. Louis about the 3rd day of May, 1890; that, before he went to St. Louis on that occasion, the plaintiff had never demanded a statement of accounts; that he asked Mr. Craig, the plaintiff's secretary, on the day he started for St. Louis, if it was necessary to take stock and make a detailed statement; that Craig said it was not, and that, if stock was taken about every quarter or so, it would be enough; that defendant might make a statement when he got back. The plaintiff pleaded the failure to comply with the stipulation by defendant in the lease to furnish it "monthly, and oftener if required," with detailed statements showing the correct status of the business, as a ground of justification for taking possession of the premises after the levy of the distress warrant, and contends that this testimony was inadmissible because of that stipulation, Craig (the secretary of the company) being without authority to waive the provision. Apart from the question of authority in Craig (which we do not decide), the stipulation in question should be regarded as a mere covenant, not as a condition, a failure to comply strictly with which would afford ground of justification for taking possession of the premises. Johnson v. Gurley, 52 Texas, 226. The evidence was admissible for the purpose of repelling any inference of bad faith in the defendant to be drawn from his failure to make the monthly statement referred to.

The testimony of the defendant complained of in the twenty-second assignment of error, tending to prove the market value of the goods at Thurber on hand April 1, 1890, instead of the cost price thereof with freight added, was properly admitted. It comported with the defendant's theory that he was the owner of the goods at the beginning of the new lease (April 1, 1890), and that the net profit to be divided between himself and the plaintiff should therefore be computed on the market value of the goods at Thurber.

In the twenty-third and twenty-fourth assignments complaint is made that the court erred in rejecting certain evidence tending to show that, under the first lease, Hunter and Marston or the appellant were entitled, excluding the monthly rental of $150, to an interest of two-thirds in the net profits of the business. These assignments are overruled, for the reason stated by us in consideration of the thirteenth and seventeenth assignments.

One D. Pat Singleton testified for the plaintiff, by deposition, to the effect, that Lawson had grossly mismanaged the saloon business. In reply to a cross-interrogatory, the following answer of the witness was read by the defendant: "I have been indicted in the District Court

of Erath County for embezzlement, and am now in the Erath County jail awaiting trial." It is urged in a bill of exceptions that this statement was inadmissible, "because it is a rule of evidence that, unless there is a conviction, there is no impeachment and no disqualification of a witness." On this question there seemed to us, on the first examination of this record, to be such a diversity in the opinions of our courts of last resort that we thought of certifying it for decision to our Supreme Court. The State v. Ivey, 41 Texas, 38; Railway v. Johnson, 83 Texas, 633; Dillingham v. Ellis, 86 Texas, 447; Carroll v. The State (Tex. Crim. App.), 24 S. W. Rep., 101. Recently, however, in an opinion by Lightfoot, C. J., of the Court of Civil Appeals for the Fifth District, a question of similar character has been quite elaborately considered, and the conclusion announced that such a course of cross-examination is proper, quoting with approval the language in the Carroll case, that it furnishes the jury, who are to pass upon the credibility of the witnesses, with a knowledge of his "surroundings and status." Ingersol v. McWillie, 9 Texas Civ. App., 546. This conclusion having been approved by our Supreme Court (87 Texas, 647) rendered in the same case on a writ of error, we overrule the twenty-fifth assignment, complaining of the admission of the evidence.

The twenty-sixth assignment complains of the overruling by the court of certain questions propounded to a witness, Adam Thornton. To a witness, H. C. Malcolm, testifying in behalf of the plaintiff, the defendant put the following cross-interrogatories: "Did you not meet Adam Thornton on Sixteenth street, in Denver, Colorado, some time early in the month of May, 1891? And didn't you have with him on that occasion substantially the following conversation: Did he not ask you when you had heard from Lawson, and did you not reply, 'I have heard nothing since I left Chicago,' and then did you not add that Lawson had promised to buy a saloon in Chicago, and give you an interest in it, in return for your devotion in staying with his (Lawson's) business at Thurber when the coal company was making it so unpleasant for Lawson's employes; that Lawson had not done this, and that now you had no more use for him? And did you not then inquire of Thornton if he knew what R. H. Ward (appellant's agent) was in Chicago for in the early part of April, 1891, and did not Thornton reply he knew all about it, and did you not say, substantially, 'Well, Ward gave me a good old time in Chicago, and I am now in the business for the money there is in it?' And then, in continuation of the same conversation, did you not admit that you had received a consideration for giving Ward a certain sworn statement as to your evidence in this suit, or as to facts connected with the controversy between Lawson and the Texas and Pacific Coal Company and its officers, the management of the saloon at Thurber?" The witness Malcolm having answered that he had no recollection of this conversation, the interrogatories were read to the witness Thornton, who, in reply to a question, testified, that he had substantially the conversa-

tion detailed. The action of the court in permitting him so to answer was proper. The inquiry was material for the purpose of impeachment, as tending to show that the testimony of Malcolm was the result of corruption. The proper predicate had been laid. The witness Malcolm, in the first instance, testified for the defendant by deposition taken in Chicago. He testified, in the second instance, for the plaintiff, by deposition taken in California. His Chicago deposition was taken by a notary, one George H. Williams. In it the witness testified to the diligent manner in which Lawson conducted the business at Thurber, and to his sober, decorous, and economical habits. The deposition of the notary Williams was subsequently taken, and, over objection by the plaintiff, the following answers of Williams were excluded: "While Malcolm was testifying, Mr. Lawson not being present, he would first read his answer from the manuscript, to the effect that he had never seen Lawson drunk, and never saw him play dice or cards; and, after reading such answer from the manuscript, Malcolm would remark that it was not true, for he had seen him drunk, and he had seen him play dice, and that he had seen him play cards; that he had seen him so drunk that he would fall down; and that he had taken him home to his room a number of times. When Malcolm would read from the manuscript that he had not seen Lawson drunk or throw dice, Mr. Marks (the lawyer superintending the taking of the deposition) would ask if that was a fact, and Malcolm would reply, 'Hell, no; he was drunk nearly all the time.' A good deal was said by Malcolm on the subject of Mr. Lawson's drinking." This evidence was sought to be introduced, on the ground, as shown by the bill of exceptions (1) to impeach the deposition of Malcolm taken at Chicago, and (2) as corroborative of Malcolm's San Francisco or California deposition. For the former purpose it was inadmissible, because no predicate had been laid by proper questions propounded to Malcolm. For the second purpose it was inadmissible, because his California deposition could not be supported by showing that at another time and place, and on another occasion, he had made similar statements. The evidence, for manifest reasons, can not be thus duplicated or multiplied.

The several concluding assignments, complaining of the insufficiency of the evidence to support the verdict, must be overruled. The evidence was sharply conflicting. The verdict indicates that the jury, in the exercise of their peculiar function, believed the statement of the witness Lawson. By their finding we are bound. Chase v. Veal, 83 Texas, 333. Applying this rule, we have closely examined the voluminous statement of facts. Analyzing this statement, in the light of the pleadings and of the evidence of Lawson, we have concluded, that in arriving at the verdict, finding a balance of $750.24 due by the plaintiff to the defendant at the time of the levy of the distress warrant, the jury probably made the following disposition of the items of the opposing accounts: The plaintiff was credited with two-thirds

of the net profits of the saloon business from April 1 to August 25, 1890, as shown by the report of the defendant, plus the items of expense contained in the defendant's expense account which were excluded by the court, such as the monthly amounts with which he gave himself credit for services as superintendent, and the sums paid by him as attorney's fees; that the plaintiff was further credited with $308.92, the balance of its merchandise account admitted to be due; that the items of $1693.45 and of $1000, for the employment of miners, claimed by the defendant, were ignored by the jury, as having come within the terms of the settlement to which Lawson testified, by virtue of which, in consideration of the surrender of the first lease, all matters accruing therefrom were wiped out; that the item of $2852.44 was absorbed by the account of plaintiff on which the balance of $308.92 was admitted to be due; that the defendant, however, was credited with the sum of $3066.50 for merchandise checks. These checks, according to the testimony of the defendant, were held by him at the time of the trial, and also at the time of the levy of the distress warrant, and for them the business had been credited as cash, and they constituted valid obligations against the plaintiff. Nor, as the jury also believed the allegations of the defendant charging the wrongful and malicious suing out of the distress warrant, and the abuse of the process of the court, are we prepared to hold that there was no basis in the evidence for the award of exemplary damages.

The judgment is affirmed.

*Affirmed.*

Delivered May 14, 1895.

Reversed by Supreme Court on writ of error, March 26, 1896.